# Staunton.

## DONA LAXTON McELROY v. COMMONWEALTH.

September 19, 1929.

Absent, West, J.

The opinion states the case.

*A. N. Kilgore*, for the plaintiff in error.

*John R. Saunders, Attorney-General*, and *Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General*, for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

Plaintiff in error was indicted in the Circuit Court of

Wise county for a malicious wounding of Lemuel Hamilton. The jury found her guilty of malicious maiming and fixed her punishment at one year's imprisonment in the penitentiary. The court refused to set aside the verdict, and entered judgment thereon. From this judgment the case is before us upon a writ of error.

It is assigned as error that the court erred in forcing the defendant to go to trial in the absence of Emmitt McElroy, the husband of the defendant, an alleged material witness for whom a summons had been issued on March 6, 1928, and returned unexecuted by the sheriff. The trial of the defendant was had on the 12th day of April, 1928. The record shows that the indictment against the defendant was found at the October term, 1927, of the circuit court. There is no dispute of the contention that Emmitt McElroy was a resident of Wise county, but it is shown that he was absent from the county during the period in which the summons was in possession of the sheriff for execution.

A statement of the essential facts from the standpoint of both the Commonwealth and the defendant will tend to elucidate the action of the trial court in refusing to grant a continuance. It appears from the record that while Emmitt McElroy, the husband of accused, was engaged in a fist fight with one Josh Collier, the accused fired a pistol at Collier, the ball missing Collier and striking Hamilton in the head, inflicting a serious wound. Collier, with two companions, was in the public road, listening to one Johnson playing the guitar, when the accused, her husband and stepson drove up in an automobile and stopped to listen to the music. The evidence adduced by the Commonwealth shows that, at the request of Collier, Johnson continued to play the guitar, and thereupon the accused said: "I am

going to treat for that," and handed to Collier a bottle which contained about a half of a pint of whiskey. The bottle was passed around and the liquor consumed. While Johnson continued to play, the accused's husband said to Collier: "What in hell do you mean?" and jumped out of the car and approached Collier in a threatening attitude and called him a vile name; thereupon, Collier struck McElroy with his fist, knocking him down. McElroy recovered and renewed the fight. The accused then got out of the car with a pistol in her hand and said to Collier: "If you hit him again I will shoot you." After making this remark, she presented the pistol at Collier and fired, the ball hitting Hamilton.

The account of the difficulty given by the accused is as follows: "I am the defendant in this case. I am the wife of Emmitt McElroy, and we live near Big Stone Gap, in Powell's Valley, in Wise county. I had a summons issued for my husband as a witness on the 6th day of March, 1928, but it was not served on my husband, for the reason that he had gone away from home a week or so after the summons was issued, to try to get work, and he has not returned.

"On the day that Hamilton was shot, Fred McElroy, one of the sons of Emmitt McElroy, came to our house in his car and I wanted to go up on Guests river to the Dean farm, where my first husband and I had lived. Emmitt McElroy borrowed the car from Fred McElroy to drive me up there. Dotsie McElroy and Emmitt McElroy got in the car and Emmitt called me to bring his pistol and put it in the car that he was afraid to leave it in the house because it had been stolen from there once before. I took the pistol and put it in the car on the seat. There was no liquor put in the car by either of us. We drove up Guests river to the place

where the shooting occurred. There were some boys in the road who had a guitar. We stopped and asked them to play for us. While we were in the car listening to the music, I put my hand in the pocket or opening in the lining of the car and felt something which felt like a bottle. I pulled it out and it was a bottle with something in it like whiskey, about half a pint. When I did this, I said: 'Look what I found.' Josh Collier, who was standing by the side of the car, took the bottle out of my hand and the crowd standing on the outside of the car drank the whiskey. After this was done, some one of them continued to play the guitar. While Josh Collier was standing by the side of the car he winked at me and my husband saw him, and he said to Collier: "What in hell do you mean,' and got out of the car. I got out of the car on the other side and as I got out I picked up the pistol which belonged to my husband, and walked around the car and told my husband to get back in the car and we would leave there. When I got round the car my husband and Collier were quarreling. Collier walked up to me and put his arm round my shoulder and asked me not to go away in the car but to go with him. I told him I was a married woman and that was my husband and I would not do that. At this time Emmitt McElroy said to Collier again: 'What do you mean, you son of a bitch,' and a fight started between Collier and Emmitt McElroy. Collier struck the first lick at McElroy and I called to Collier to stop the fight, but he kept on striking my husband, and I told him if he struck him again I would shoot him, and I threw up the pistol and fired. I did not take any aim. I was very much excited and as I thought Collier was going to kill my husband or do him some bodily harm. I did not know Collier at that time and did not know that the ball had missed

Collier and hit Hamilton. We did not know the boys and never had any trouble with them or either of them before. We had not drunk any liquor on that trip and I did not get out of the car for the purpose of harming anyone. At the time I drew the pistol on Collier and shot I believed it was necessary to do this in order to protect my husband from serious harm, as I did not know how many of the crowd would help Collier, and beat my husband up. The pistol was stolen by my stepson, Fred McElroy, but he had brought it back.''

The accused is corroborated almost word for word by her stepson. Collier denied the charge of the accused that he had winked at the accused, put his arm around her, or made any improper proposal to her, and further stated that accused seemed ''to be very much excited or drunk.''

■ The general rule is that a motion for continuance is addressed to the sound discretion of the trial court, and that while the appellate court is invested with supervisory powers, it will not reverse the action of the trial court in refusing to grant a continuance, unless such action was plainly erroneous. *Hite's Case*, 96 Va. 493, 31 S. E. 895, 896, and authorities cited.

■ ■ In the instant case no affidavit was filed by the accused setting forth the materiality of the absent witness. No allegation is made that the husband, if present, would have testified to a single material fact, in aid of accused, that was not offered in her defense. That he would have testified substantially as had accused and the stepson is plainly inferable. Such evidence would have been purely cumulative. It would be going far afield to argue that the jury would have given such credit to the evidence of the absent husband as would have led to an acquittal, when the jury refused

to give credit to the evidence of the accused, corroborated even to the minutest detail by the stepson.

■ The true rule which should guide the trial courts in passing upon a motion for continuance is not that the evidence is merely cumulative and corroborative, but that it is of such a material character that only the absent witness is cognizant of it, and that the accused would be put to a great disadvantage in being deprived of such evidence.

■■ While it is true that the summons for Emmitt McElroy was duly issued and directed to the sheriff of Wise county, his voluntary absence from the county at this critical time (which absence was known to the accused, and this fact was not imparted to the sheriff of Wise county), must have influenced the trial court in reaching the conclusion that the real basis for the motion was to evade the trial. Where the circumstances of the particular case satisfy the court that the real purpose in moving for a continuance is to evade a trial, then, though the witness has been actually summoned and the party accused has made affidavit showing the materiality of the absent witness, and that he cannot safely go to trial without the witness, the continuance should be refused, *Hewitt* v. *Commonwealth*, 17 Gratt. (58 Va.) 627; *Mendum* v. *Commonwealth*, 6 Rand. (27 Va.) 704.

There is no merit in this assignment of error.

■ The second assignment of error is as follows: "Because the court erred in giving the written instructions on behalf of the Commonwealth, over the objections of the defendant."

The record fails to disclose that the objections to the instructions now urged upon us were made to the trial court when the instructions were offered by the Commonwealth. The record does show that when the

instructions complained of were presented, the defendant, by counsel, merely objected to their being given. Under Rule 22 of this court, the party objecting to an instruction "shall state with reasonable certainty the ground of such objection, and, unless it appears from the record to have been so stated, such objection will not be considered by this court, except for good cause shown, or to enable this court to attain the ends of justice."

No good cause has been shown for the failure of accused to state her grounds of objection to the trial court; therefore, while we deem it unnecessary to enter upon a full discussion of this assignment of error, we will state that the instructions, as applied to the facts of the case at bar, are free from error and no injustice has been done the accused by giving them to the jury.

█ █ It is assigned as error that the accused was not tried by a panel of twelve jurors free from exception, as required by section 4895 of the Code of 1924, for this, to-wit: "That I. N. Kelly, Jr., one of the jurors, was related to the accused." In support of her motion to set aside the verdict on the ground that the jury panel did not conform to the requirements of section 4895, the accused filed the affidavits of Rachel Laxton and herself, showing that accused and juror Kelly were cousins in the third degree; that accused was not aware of the relationship until after the trial of the case.

Section 4895 provides, in part, as follows: "If there is drawn from the box the name of a person who has died, removed from the county or city or is related to the accused or to the prosecutor, or, in a case of homicide, to the deceased, or who is known to the clerk or other persons attending the drawing, if the case be in a circuit court of a county, to live within two miles of the place where the crime is charged to have been com-

mitted, such name shall not be placed on the list as they are drawn, and when twenty-four names have been so placed the drawing shall cease, and a copy of said list shall at once be made and signed by the clerk and the persons attending the drawing, which copy shall be filed in the clerk's office.

"No irregularity in any writ of *venier facias* or in the drawing, summoning, returning or impanelling of jurors, or in making out or copying or signing or failing to sign the list, or in drawing more persons than four in excess of the number to be summoned, shall be cause for summoning a new panel or for setting aside a verdict or granting a new trial, unless objection thereto, specifically pointed out, was made before the jury was sworn, and unless it appears that such irregularity, or error, or failure, was intentional or such as to probably cause injustice to the Commonwealth or to the accused; and no judgment shall be arrested or reversed for the failure of the record to show that there was a *venire facias*, unless made a ground of exception in the trial court, before the swearing of the jury."

In construing the section relied upon it is to be observed that the inhibition in regard to relationship applies to the prosecutor as well as to the accused. The language employed clearly evinces the intention of the legislature to preclude from jury service those persons who by reason of blood relationship may be biased or prejudiced, so as to afford a fair and impartial trial of the case. If the juror, Kelly, had been closely related to the prosecutor, Hamilton, unquestionably he would have been an incompetent juror, "for the law presumeth that one kinsman doth favor another more than a stranger." Coke Lit., 157. No attempt was made to show that the juror had any ill will towards the accused. The verdict demonstrates

that the accused was dealt with leniently. It was in the power of the jury to fix the punishment of the accused at ten years in the penitentiary. She was, however, given the minimum punishment prescribed for a malicious wounding. Under this view of the case, we are unable to say that the accused has probably been done an injustice.

There is no merit in this assignment of error.

 The remaining assignment of error calls in question the action of the court in refusing to set aside the verdict of the jury on the ground that it is contrary to the law and the evidence.

The court, upon motion of the accused, gave the following instructions:

"The court instructs the jury that the right of self defense is founded upon the law of nature; that this natural right of self defense includes the right to defend those who stand in the relation of husband or wife, parent or child. And if the jury believes from the evidence in this case that Dona McElroy fired the shot that wounded Lemuel Hamilton in the defense of her husband, or what appeared to her to be the necessary defense of her husband, then the jury should find her not guilty.

"The court instructs the jury that if they believe from the evidence in this case that there arose an altercation or difficulty between Josh Collier and Emmitt McElroy, the husband of the defendant, and that Josh Collier was the aggressor; that the defendant at the time she shot honestly believed that her husband was in imminent bodily danger, and that she fired the shot at Josh Collier in what she honestly believed the defense of her husband, but actually hit Lemuel Hamilton, a by-stander, then Hamilton stands in the place of Collier, and if the defendant was justified in

shooting Collier, then you can not punish her for shooting Hamilton.

"The court instructs the jury that if they believe from all the evidence of the Commonwealth and of the defendant that Josh Collier, on the public highway in Wise county, assaulted Emmitt McElroy, the husband of the defendant, and that the said assault was of such character as to cause the defendant, Dona McElroy, to fear and believe that great bodily harm would be inflicted on her husband by Josh Collier, and that the defendant had reason to believe and did believe that her husband was in danger of receiving serious injury at the hands of Josh Collier, and that she acted without malice or previously formed design, and that she fired the shot at Josh Collier in the necessary defense of her husband at the time when it reasonably appeared to her that he was in danger of receiving serious bodily harm, then the jury should find her not guilty.

"The court instructs the jury that if they believe from the evidence in this case that Josh Collier did any act or that there were circumstances brought about by him of such character as to afford the accused reasonable grounds to believe that Josh Collier, in conjunction with others, designed to inflict on Emmitt McElroy great bodily harm, and that there was imminent danger of carrying such design into immediate execution, then under the circumstances, the defendant, Dona McElroy, is excusable, although it may have turned out that the appearances were deceptive, and that there was no design on the part of Josh Collier to kill or seriously harm Emmitt McElroy."

These instructions presented to the jury the contentions of the accused in a most favorable light. The evidence as denoted in the statement of facts, *supra*, is in hopeless conflict. The jury accepted the view of

the Commonwealth that the attempted assault upon Collier, which resulted in the serious wounding of Hamilton, was without excuse or palliation.

We are of opinion that the evidence is amply sufficient to sustain the verdict, and the judgment of the circuit court must be affirmed.

*Affirmed.*